STATE OF LOUISIANA IN THE INTEREST
OF Z. U.

NO. 20-CA-26

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA


ON APPEAL FROM THE JEFFERSON PARISH JUVENILE COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 2018-CC-90, DIVISION "C"
HONORABLE BARRON C. BURMASTER, JUDGE PRESIDING


May 13, 2020


**SUSAN M. CHEHARDY**
**CHIEF JUDGE**


Panel composed of Judges Susan M. Chehardy,
Fredericka Homberg Wicker, and John J. Molaison, Jr.


**REVERSED AND REMANDED.**
    **SMC**
    **FHW**
    **JJM**

COUNSEL FOR PLAINTIFF/APPELLANT,
STATE OF LOUISIANA, DEPARTMENT OF CHILDREN AND FAMILY
SERVICES
    Laura W. Malveau

COUNSEL FOR DEFENDANT/APPELLEE-2ND APPELLANT,
Z. U.
    Kirby N. Kenny

COUNSEL FOR DEFENDANT/APPELLEE-3RD APPELLANT,
M. A. AND W. A.
    Sheila H. Willis
    Bernadette R. Lee
    Suzanne Ecuyer Bayle
    Edith H. Morris

COUNSEL FOR INTERVENOR/APPELLEE,
C. L. AND J. L.
    Scott L. Sternberg
    William B. Gordon, III

**CHEHARDY, C.J.**

On appeal, the State of Louisiana, Department of Children and Family Services-first appellant; the minor child, Z.U.-second appellant; and intervenors/third appellants-W.A. and M.A.; seek review of the trial judge's October 1, 2019 ruling regarding the continued placement of the minor child, Z.U. For the following reasons, we vacate the trial court's ruling and remand for proceedings consistent with this opinion.

Factual and Procedural History

On August 29, 2018, the State of Louisiana, Department of Children and Family Services ("DCFS") received a report of a child born "drug affected" to parents domiciled in Jefferson Parish. At the time of his birth on August 28, 2018, Z.U.[1] tested positive for cocaine, barbiturates, amphetamines, marijuana, and benzodiazepines. That day, his mother, E.U., also tested positive for benzodiazepines, cocaine, opiates, barbiturates, amphetamines, and marijuana. Because Z.U. was suffering from withdrawal from these substances, he was hospitalized until October 19, 2018 in the neonatal intensive care unit at Ochsner Baptist Hospital in Orleans Parish. In the interim, his biological father, F.U., died from a drug overdose on September 15, 2018. Z.U.'s uncle, W.A., visited the infant while he was still in the NICU during the time that W.A. was in Louisiana in September 2018 for the funeral services of Z.U.'s father. Sometime after the death of Z.U.'s father, E.U., his mother contacted W.A. to inform him that DCFS was going to take Z.U. into custody when he was released from the NICU. W.A., who resides in New York already had custody of E.U.'s older son, Ze.U., who was born April 29, 2016, also "drug affected." W.A. contacted DCFS at that time and informed them that he did not want his nephew to be placed into foster care, and

---

[1] To protect the identity of the minor children involved, the parties will be referred to using initials. U.R.C.A. 5-1, 5-2; *L.R.F. v. A.A.*, 13-797 n.2 (La. App. 5 Cir. 2/26/14), 133 So.3d 716, 717.

that he and his wife, M.A., would like to be considered for placement of the baby if Z.U. was not going to be returned to E.U.'s custody when he was discharged.

Upon his discharge on October 19, 2018, Z.U. was placed in the temporary custody of DCFS after their investigation determined that Z.U.'s mother had ongoing substance abuse problems that prohibited her from exercising physical custody of Z.U.[2] While W.A. had indicated his wish to be considered for placement of the child, in order for DCFS to execute its original plan for reunification with the mother, out of state placement was not a viable option. DCFS placed Z.U. in the certified foster home of C.L. and J.L. located in Jefferson Parish, as at this point in time no alternative in state family placement was available for this minor child. This would allow DCFS an opportunity to create and execute a reunification plan with E.U.

On November 26, 2018, after further investigation, the Jefferson Parish District Attorney filed a *Child in Need of Care* ("CINC") Petition pursuant to La. Ch. C. art. 606(A)(2), alleging that Z.U. was in need of care due to his mother's continued struggle with addiction after the death of his father. The child was also continued at that time in the original placement in the foster home of C.L. and J.L. On December 18, 2018, Z.U.'s mother, pursuant to La. Ch. C. art. 647, stipulated that Z.U. was a child in need of care without admitting to the allegations of the petition. DCFS filed a plan of reunification, with which E.U., his mother, was attempting to comply. Tragically, on February 3, 2019, Z.U.'s mother died from a drug overdose.

Shortly thereafter, according to the testimony of the original DCFS foster care caseworker, Gerriane Jones, W.A., Z.U.'s paternal uncle, who had already been in contact with DCFS after the death of his brother in September of 2018

---

[2] Z.U. also has three half-sisters, E.M., B.M., J.M., who reside in Louisiana; one biological sister, Zy.U., who resides in Texas; and one biological brother, Ze.U., who resides in New York with W.A. and M.A.

regarding the status of the child, communicated with DCFS regarding permanent placement of the child. In the interim, DCFS had become aware of another individual who had made a claim to the paternity of Z.U. This information interjected some confusion into the infant's status, and W.A. hesitated initially regarding the transfer of the child to his care in the days after the mother's death. However, according to Ms. Jones records, W.A. texted her on February 21, 2019, "Good afternoon Mrs. Jones, after the last time that we spoke my wife and I prayed about this situation. In remembering the conversation with my brother and keeping with his wishes I have reconsidered and am looking to move forward in the process of caring for the baby. My brother had recognized the baby as his son and my promise was to care for his family. I would like [to] continue with ICPC process." In early March of 2019, paternity testing was performed by DCFS, and the putative father of Z.U. was excluded.

Shortly thereafter, W.A. and M.A., Z.U.'s paternal uncle and aunt, and the legal guardians of Z.U.'s older brother, Ze.U., age 2 at that time, contacted DCFS in their home state of New York to initiate the process of becoming certified foster parents, and to alert that office that an Interstate Compact for the Protection of Children ("ICPC") would be filed with the DCFS office in New York by the DCFS office in Jefferson Parish. This was being done to initiate the process of transferring the placement of Z.U. to them. On March 6, 2019 W.A. sent a text to Ms. Jones inquiring about his nephew and asking about the status of the ICPC. Ms. Jones replied that "The ICPC is in the works." Ms. Jones, according to her testimony, had also by this time informed the foster parents, C.L. and J.L. that Z.U. would be transitioning to a family placement in New York. Only later would W.A. and M.A. discover the extent to which the DCFS caseworker was lying to them regarding the institution of the ICPC, and the transition for the placement of Z.U. This is the first, but most egregious, in a string of events in which DCFS failed in

3

this matter to act in the best interest of this minor child, and in accordance with their own directives. Z.U. was six months old at this time.

On April 16, 2019, DCFS filed an *Ex parte Motion and Order to Declare the Minor Child Free and Eligible for Adoption* on the basis that his biological parents were both deceased. At the hearing on that motion, the trial judge heard from Ms. Jones, who was still the acting DCFS caseworker for foster care, regarding Z.U.'s current placement. Ms. Jones testified that Z.U.'s paternal great-aunt and grandmother had visited him twice while he was in foster care. Ms. Jones also testified that Z.U.'s paternal uncle, W.A., stated that he was open to caring for him "long term or to adopting him", and the case plan signed by Ms. Jones on April 4, 2019, and submitted into the record at that time, indicated that DCFS in Jefferson Parish had begun the ICPC process with New York. Both foster parents were at the hearing and were aware that it was the intention of DCFS to transition Z.U. to his aunt and uncle in New York. At the close of that hearing, the Court found that the case plan submitted by the Department was consistent with the health and safety of the child and the case plan goal was adoption. The court ordered DCFS to file a written plan for permanent placement within 90 days pursuant to La. Ch. C. 1040. Finally, the Court determined that continued placement with the foster parents in Louisiana was "the safest, least restrictive, most appropriate setting for Z.U. at this time." None of the directives of the court issued at this hearing to DCFS were subsequently implemented by Ms. Jones.

Shortly after the hearing in April, W.A. continued to contact DCFS, and was repeatedly told that the ICPC paperwork was in progress. This subterfuge continued until sometime later when the DCFS case worker began to ignore continued contact by W.A. with the agency. Whether this amounted to gross negligence or an outright attempt to thwart Z.U.'s family placement, we may never know, as this information was never developed in the record before this Court.

4

Frustrated in his attempts to obtain further information from DCFS, on June 26, 2019, W.A. and M.A., Z.U.'s paternal uncle and aunt, filed a *Petition to Intervene*, indicating that W.A. is the older brother of Z.U.'s biological father, that W.A. and M.A., who are New York residents, had become certified foster parents in anticipation of adopting Z.U., and that they are currently custodians of Z.U.'s older brother, Ze.U. On July 30, 2019, Judge Burmaster granted the aunt and uncle's intervention and ordered a status hearing with respect to the Interstate Compact for the Placement of Children ("ICPC") with the State of New York and that visitation with the minor child, ten months old by this time, be allowed, which visitation was eventually accomplished without incident on several occasions.

Sometime after the July 30, 2019 hearing, the judge in this matter received an *ex parte* communication from the foster parents, who retained physical custody of the child, regarding the detrimental effects that could occur should the court decide to continue with the DCFS plan of placement of Z.U. with his now 3 year old brother and paternal family members in New York. By this point, the foster parents had also made their intention to adopt Z.U. known to DCFS. Attached to this correspondence were articles, photos and other information sourced by the foster parents from the internet. The trial court did not inform any of the parties, DCFS, the intervenors, or the advocate appointed to represent the child, of this communication. The court did not send a copy of the communication, or its attachments to any party, instead the letter and attachments, after being read by the judge, were placed in the record.

On August 20, 2019, the trial court held a status hearing on visitation and the transition plan by DCFS for Z.U. After the hearing, which included testimony from the foster parents who were still non-parties to the matter at that time, regarding the potential adverse impact of removal on toddlers with special needs, the trial court declined to allow DCFS to read a consent judgement into the record,

5

or to approve the transition plan because "we need expert opinions on what would be best for the child." The trial court instructed DCFS to present testimony at the next status hearing from "Dr. Zeaneh or someone familiar with the case with T-PEP … and indicate whether or not they agree with the transition plan and the long-term adverse effects on moving the child from current placement. T-PEP is to assess whether the child should remain in current placement and be adopted by current caregivers with visits by the relatives in New York or vice versa." Z.U., who would turn one on August 28, 2019, had now become the object of a tug-of-war between his biological family and his foster family.

Shortly after this hearing, on September 5, 2019, the foster parents, C.L. and J.L., filed a Petition "to intervene and participate in any proceedings involving the Child, Z.U., and in due course [be] allowed to adopt the Child." On September 17, 2019, the foster parents' intervention was granted "for [the] limited purpose of best interest for the child." The foster parents, subsequent to the hearing on August 20, had also contacted the same Dr. Zeaneh that the trial court had referred to at the August 20, 2019 proceeding, and employed him to testify on their behalf.

Dr. Zeaneh and T-PEP, the Tulane Parenting Education Program, were *under contract with DCFS at that time* as an independent reviewing agency of case plans that the agency was in the process of implementing. When DCFS discovered that Dr. Zeaneh had been privately requested to give his opinion on behalf of the foster parents, DCFS believing that Dr. Zeaneh had a conflict, decided to utilize another child mental health expert to review the case plan. DCFS brought in Dr. Amy Dickson at that time, who after reviewing the plan, agreed that Z.U. should be transitioned to his paternal family in New York.

On October 1, 2019, the trial court held an ASFA case review, permanency hearing, and status hearing as to the New York ICPC and visitation for Z.U.'s uncle and aunt. None of the documents filed into the record at this time indicate

6

any negative information regarding the fitness of W.A. and M.A. for placement or as prospective adoptive parents of Z.U. At the hearing the trial judge heard testimony from Z.U.'s paternal uncle and aunt, W.A. and M.A.; his foster parents, C.L. and J.L.; and, his maternal grandmother, E.H. E.H. testified on behalf of the foster parents that she and Z.U.'s three older half-sisters had been allowed to visit twice with Z.U. while he was in foster care, and she had confidence that Z.U. would be able to maintain a relationship with his older half-siblings if he continued to live with C.L. and J.L. E.H. stated that she had never been in contact with anyone from Z.U.'s paternal family, although Ze.U., who lives with his paternal uncle W.A., is her other grandson. E.H. also testified that she has not had contact with Z.U.'s sister, her granddaughter age 2, who resides with Z.U.'s paternal aunt in Texas. As a result, she testified that she believes that she would lose contact with Z.U. if he were adopted by W.A. and M.A, and raised out of state.

The trial court also heard from Z.U.'s original DCFS foster caseworker, Ms. Jones. Ms. Jones testified that she alerted the foster family about paternal family members in January before the birth mother's death because several family members had expressed an interest in visiting with baby Z.U. Ms. Jones testified that when she spoke with W.A. in February of 2019 immediately after the mother's death, he was told that another man had come forward to assert paternity of Z.U. While this had initially caused some concern as to the paternity of Z.U., as excerpted earlier in this opinion, on February 21, 2019 W.A. texted Ms. Jones and informed her that in "keeping with [my brother's] wishes I have reconsidered and am looking to move forward in the process of caring for the baby. My brother had recognized the baby as his son and my promise was to care for his family. I would like [to] continue with ICPC process." Ms. Jones also testified that despite her conversation in February with the paternal uncle in New York that he wished to proceed with the ICPC to gain custody of and eventually adopt Z.U., she learned at

7

the hearing in April that the foster parents had also indicated their desire to retain custody and eventually adopt Z.U. once he was adjudicated eligible by the court.

Detra Ward, the Child Welfare Manager over Foster Care and Adoptions for DCFS in this region, has been the supervisor and manager of this case from the time that Z.U. was taken into DCFS custody in October of 2018. Ms. Ward testified that the foster parents were once candidates to adopt Z.U., but are no longer being considered because of "the sibling connection" and the paternal uncle's interest in adopting this child.

Ms. Ward also admitted that when Z.U. was born, W.A. did not initially want to foster Z.U. because another man had made a claim to the paternity of Z.U. According to Ms. Ward, W.A. did not immediately express interest in adoption but when "the case was transferred to the adoption unit in June of [2019]," W.A. had expressed interest in adopting Z.U., who was at that point 10 months old. Ms. Ward testified that she worked with Troy Thomas in June and July to create the transition plan that would have allowed W.A. to move forward and adopt Z.U.

Troy Thomas testified that she was the current DCFS foster care caseworker assigned to Z.U. and she had been assigned on June 21, 2019, after Ms. Jones had been relieved of this case file. Ms. Thomas testified that she immediately noticed that Z.U.'s paternal uncle had been in contact with the agency numerous times about adopting him. Ms. Thomas informed the foster parents during a visit at the DCFS office between Z.U. and his paternal grandmother on July 26, 2019 of his uncle's intention to adopt him. Ms. Thomas also testified that during the initial visitation in July between Z.U. and his uncle W.A., Ms. Thomas observed Z.U. with W.A. and noticed that Z.U. "really only wanted [W.A.]'s attention."

Ms. Thomas testified that since August of 2019 she and her supervisor, Detra Ward at DCFS have been preparing a transition plan to allow W.A. and M.A. to adopt Z.U., which involved extended visits between Z.U. and W.A. in the

DCFS office, an overnight visit by Z.U. and W.A. in Louisiana, a weekend stay by Z.U. with his family in New York, progressing to a week-long stay by Z.U. in New York. Ms. Thomas herself traveled to New York with Z.U. to facilitate that week-long trip. When questioned about being contacted by T-PEP about the appropriateness of the visitation plan for Z.U., Ms. Thomas answered, "I don't recall using best interest at all. …We talked with T-PEP about it, Letia Bailey and Hien Le Sanchez. We went over what we were planning. And they said, they agreed."

At trial, Hein Le Sanchez, a licensed clinical social worker with T-PEP, who had been requested to provide support to the foster family on a single occasion in May, testified that at the request of T-PEP, after being contacted by the foster family to involve them in the transition, she met with Detra Ward and Troy Thomas on August 18, 2019, regarding a visitation plan she was told by the foster parents had been prepared by DCFS for Z.U. According to Ms. Sanchez, the plan included the toddler going to New York as soon as possible, then continuing his relationship with his foster family via FaceTime meetings. Ms. Sanchez expressed concern over the baby being asked to travel to New York continually, rather than W.A. and M.A. travelling here to spend an extended period of time getting to know Z.U. in his current placement.

Ms. Sanchez stated that she did not agree that an immediate transfer of Z.U. to New York with FaceTime contact with his foster family was in the child's best interest. "We said that we did not think this was in his best interest. That we did not." Ms. Sanchez specifically noted that FaceTime is "not a substitute for interaction with a young child at Z.U.'s age." When questioned by counsel for DCFS as to whether she had told either DCFS employee that their plan sounded "good," Ms. Sanchez reiterated, "We said that this was not – we did not believe that this was in his best interest." Ms. Sanchez did however admit that no one at T-

PEP had ever actually seen the final transition plan prepared by DCFS, as DCFS had already contracted with another provider to review the plan.

Testimony from Dr. Alicia Pellegrin was offered by W.A. as she was unavailable to testify at this hearing. In her opinion, "the younger the child, very often, the longer the transition." Dr. Pellegrin reviewed the records in the matter and, in her opinion, there was already a basis for a secure attachment between Z.U. and his uncle and aunt. She testified that, "Children are not only more physically secure and physically stable in kinship placement, but they are also more emotionally and behaviorally stable." She went on to state that, "Children who are placed with family members have fewer emotional and behavior problems." She opined that, "One study, in particular, showed that those children were indistinguishable from children who were placed with biological parents." Dr. Pellegrin also discussed that having a biological sibling was very important.

DCFS called Dr. Amy Dickson, a psychologist that was accepted as an expert in infant and child mental health, and with whom DCFS had contracted to review the transition plan for Z.U. Dr. Dickson testified that her observation of Z.U. with both his foster family and his uncle showed that he was well-cared-for by the adults. Dr. Dickson expressed that she felt the foster parents had done an excellent job of caring for this child, who faced tremendous obstacles, including being born with neonatal abstinence syndrome and losing both of his parents. Further, in Dr. Dickson's opinion, the foster family's attachment to Z.U. had allowed Z.U. to be able to develop attachments, which would in turn enable him to attach to others in the future, including his uncle and aunt. In Dr. Dickson's opinion, "there's no indication that Z.U. necessarily will be traumatized or struggle by going to [W.A. and M.A.] if he can have an ongoing connection to [his foster parents]." Dr. Dickson was the only expert witness called to testify who had observed Z.U. interact with all parties in this matter.

Dr. Charles Zeanah, also with T-PEP, who testified at the request of the foster parents, opined that children develop the capacity to form attachments at a cognitive age of seven to nine months. Attachment is the motivation of a young child to seek comfort, support, nurturance, and protection from specific individuals or "attachment figures." Dr. Zeanah testified that he had evaluated the foster parents and observed their interaction with Z.U. and, in his opinion, Z.U. is securely attached to both C.L. and J.L. Dr. Zeanah also testified that he has never observed any interaction between Z.U. and his uncle, aunt, or brother, or any of his other biological family.

He further testified that a disrupted attachment is when an attachment that has been formed then ends. Dr. Zeanah testified that there can be long-term consequences of disrupted attachments, and he opined, research shows that if a focused attachment is disrupted after it is formed from seven to nine months, the child has some risk of subsequent problems. If the focused attached is disrupted after twelve months, the child's risk of adverse outcomes increases. Moreover, children with more than one disruption are at increased risk for problems. Dr. Zeanah also testified that the cumulative risk phenomenon reflects that the probability of a child developing long-term problems increases with the sheer number of risk factors without regard to their severity, their chronicity, or their nature.

Dr. Zeanah stated that Z.U. has multiple adverse exposures, which are all risk factors, including, being orphaned; his mother smoking while pregnant; no prenatal medical care; his mother's incarceration during pregnancy; severe neonatal abstinence syndrome; a seven-week hospitalization in the NICU; and fifty-one days post-natal in methadone treatment.

When specifically asked about his recommendation for Z.U., Dr. Zeanah stated, "I think it's very complicated. And I think you weigh the value of genetic

relationships and you count that and you weigh the consequences or at least the increased probability of harm associated with disruptions and when I put all that together, I believe that it's in [Z.U.]'s best interest to remain where he is and to remain connected to his biological extended family."

When asked on cross-examination by DCFS how he can recommend a non-family placement, Dr. Zeanah testified "so genetic family is generally preferred. Stability versus disruption, stability is preferred, and I weigh the stability and the potential harm of disruption over the genetic versus non-genetic connection." Dr. Zeanah did state that the child, [Z.U.], could reattach to another caregiver with proper support from T-PEP, his former caregivers, and mental health providers.

At the close of that hearing, Judge Burmaster stated:

> And I think the evidence to me clearly says it is his best interest to avoid the disruption and keep him with the current foster parents. He has three siblings in Metairie, three in New Orleans as testified to, in his mind, those are his siblings also, one in New York, one in Texas. We might get the one in Texas to move to New York. I think the best way to make sure he has, and ensures his continued connection with that extended family and whole family is to stay with the foster parents. They're the ones who are going to ensure that happens. I've heard testimony from the maternal grandmother that even though [Ze.U.] is with the Angelinos, there has been no attempt to make any connections with that particular child. I think the child -- I think [Z.U.]'s best interest, and with all due respect, [Ze.U.] has a best interest finding also but it's not my finding. It's not my finding, it's [Z.U.]'s best interest. That's the only case set before me and I believe that his best chance to have a connection with all his family is to remain with foster family and it's also in his best interest to remain with the foster family and stay in his current placement.

The trial judge further ordered that DCFS not move "Z.U. … from the current placement without a court hearing." The notice of judgment was issued on October 4, 2019.

On October 7, 2019, DCFS, pursuant to La. Ch. C. art. 330, filed a motion for appeal, which was granted on October 9, 2019. On October 16, 2019, attorney for Z.U., pursuant to La. Ch. C. art. 330, filed a motion for appeal, which was

granted. On October 18, 2019, pursuant to La. Ch. C. art. 330, W.A. and M.A. moved for appeal, which was granted.

On appeal, counsel for first appellant-DCFS assigns three errors: first, the trial court erred by failing to adopt the transition plan proposed at the October 1, 2019 hearing; second, the trial court erred by failing to approve placement of Z.U. in the home of his paternal uncle and aunt, W.A. and M.A.; and, third, the trial court erred in its best interest finding made at the October 1, 2019 hearing. On appeal, second appellant-the minor child, Z.U., assigns three errors: first, it is in his best interest that the trial court approve his placement with his paternal uncle and aunt; second, it is in his best interest to be transitioned to his paternal uncle's home with his uncle and aunt and his biological brother; and third, DCFS has sole authority over placement of children in its custody and the court cannot order permanent placement. On appeal, counsel for third appellants-W.A. and M.A., assigns three errors: first, the misbehavior of one caseworker from DCFS should not be grounds to prevent the placement of Z.U. with his paternal uncle who has custody of his full brother and has wanted him since his birth; second, the trial court erred in allowing the foster parents to undermine the DCFS transition plan of Z.U. to his paternal uncle; and third, the court committed legal error by allowing the expert hired by the foster parents to improperly undermine DCFS. In essence, all appellants agree that the trial court erred in its October 1, 2019 ruling and seek reversal of that ruling. We agree.

Law and Discussion

*Standard of Review*

In *Evans v. Lungrin*, 97-0541 (La. 2/6/98), 708 So.2d 731, 735, the Louisiana Supreme Court enunciated the standard of review in custody proceedings:

It is well-settled that a court of appeal may not set aside a trial court's … finding of fact in the absence of 'manifest error' or unless it is 'clearly wrong.' *Rosell v. Esco*, 549 So. 2d 840, 844 (La. 1989). However, where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent *de novo* review of the record and determine a preponderance of the evidence. *Ferrell v. Fireman's Fund Ins. Co.*, 94-1252 (La. 2/20/95), 650 So.2d 742, 747, *rev'd in part, on other grounds*, 96-3028 (La. 7/1/97); 696 So. 2d 569, *reh'g denied*, 96-3028 (La. 9/19/97), 698 So.2d 1388. A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. *See Lasha v. Olin Corp.*, 625 So.2d 1002, 1006 (La. 1993). Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. *See Lasha*, 625 So.2d at 1006. When such a prejudicial error of law skews the trial court's finding of a material issue of fact and causes it to pretermit other issues, the appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential material facts *de novo*. *Lasha*, 625 So.2d at 1006.

Thus, where one or more trial court legal errors interdict the fact-finding process, this Court should make its own independent *de novo* review of the record and determine a preponderance of the evidence. *Evans, supra*.

At the outset, we note that the purpose of Title VI of the Children's Code, entitled "Child in Need of Care" and applicable to these proceedings, is "to protect children whose physical or mental health and welfare is substantially at risk of harm by physical abuse, neglect, or exploitation and who may be further threatened by the conduct of others...." La. Ch. C. art. 601. Furthermore, the health, safety, and best interest of the child shall be the paramount concern in all proceedings under this Title. *Id.* Here, Z.U. is in a unique circumstance because he was orphaned in the midst of a CINC proceeding.

There are two separate components of permanency planning: (1) the initial case plan (La. Ch. C. arts. 671 to 677) and its review hearing process; and (2) the identification of a permanent plan for the child and its review hearing process (La. Ch. C. arts. 701 to 711). Permanent placement is defined in the Children's Code as (1) return of the legal custody of the child to his parent(s); (2) placement of the

child under a guardianship of the person; or (3) placement of the child with adoptive parents pursuant to a final decree of adoption. La. Ch. C. art. 603(15). This case review and dispositional review process continues until the child achieves the proposed permanent plan. Nonetheless, "an assignment of legal custody to DCFS, *regardless of the stage of the proceedings*, confers the *exclusive authority* of DCFS to determine a particular placement of a child." *See*, La. Ch. C. art. 672, Official Comments, 2001. (Emphasis added).

La. Ch. C. art. 672(A) provides:

A. (1) Whenever custody of a child is assigned to the Department of Children and Family Services, the child shall be assigned to the custody of the department rather than to a particular placement setting. The department shall have authority over the placement within its resources and the allocation of other available resources within the department for children judicially committed to its custody.

(2) Upon motion of the court, for good cause shown, a contradictory hearing shall be held and thereafter, the presiding judge shall have the authority to disapprove a placement chosen by the department if it is not in the best interest of the child and shall issue a written order that the department choose a more suitable placement with reasons supporting the court's decision.

The plain language of this statute clearly provides that when the court assigns custody of a child adjudicated in need of care to DCFS, the Department has authority over the placement of those children. Further, it is well-settled in our jurisprudence as well that the juvenile court retains the ultimate authority over a child's placement. *See State in the Interest of Jennifer W.,* 485 So.2d 504, 506 (La. 1986); *State In Interest of B.F.*, 19-115 (La. App. 5 Cir. 8/9/19), 279 So.3d 453, 470 (both recognizing that statutes which gave the courts the authority to review the status of children placed in the custody of the Department allowed the courts to have the ultimate authority over a child's placement).

Further, the public policy preference for "kinship" placement is reflected in La. Ch. C. art 683(B), which provides: "The court shall place the child in the

custody of a relative unless the court has made a specific finding that such placement is not in the best interest of the child. The court shall give specific written reasons for its findings, which shall be made a part of the record of the proceeding."[3]

La. Ch. C. art. 700(A),[4] which was intended to clarify the role of the court vis-à-vis the role of DCFS as set forth in La. Ch. C. art. 672, provides as follows:

> A. At the conclusion of the case review hearing, the court may take one of the following actions:
>
> (1) Approve the plan as consistent with the health and safety of the child and order compliance by all parties.
>
> (2) Find that the case plan is not appropriate, in whole or in part, based on the evidence presented at the contradictory hearing, and order the department to revise the case plan accordingly.

Therefore, under the scheme imposed by these provisions, the court, at the conclusion of the case review hearing, may either approve the plan or reject it and order DCFS to revise the plan accordingly. The court cannot, however, direct the placement of children in the Department's custody as the trial court did in this case, i.e. "Z.U. must remain in the custody of the foster parents." While the district court was within its authority to consider and deny DCFS's recommendation for transitioning Z.U. to an out-of-state kinship placement, to the extent that the judgment of the district court rejected DCFS's "plan" and instead ordered permanent placement of Z.U. with the foster parents, the district court legally erred. DCFS, Z.U., and W.A. are all correct in their assertions that the question of where a child in its legal custody should be placed is reserved to DCFS.

This is a legal error that interdicted the fact-finding process, which allows this Court, if the record is otherwise complete, to make its own independent *de novo* review of the record and determine a preponderance of the evidence. *Evans, supra*.

---

[3] *See also*, La. Ch. C. arts. 622 and 627.
[4] *See*, La. Ch. C. art. 700, Official Comments, 1991.

16

On appeal, the record before us does not contain a formal or permanent placement request by DCFS to the trial court. The most recent case plan in the record before this Court dated September 19, 2019 states: "The agency recommends that Z.U. remain in state's custody at this time, in his current placement as we continue with transitioning Z.U. to the home of his paternal aunt/uncle, with a case plan goal of adoption."

Although we are cognizant that the paternal family, the foster parents, and, most importantly, and tragically, Z.U., are caught in an emotional situation that was created by DCFS' mismanagement and failure to timely procure the ICPC, our *de novo* review of this record reflects that it is apparent that the trial court erred in failing to approve the DCFS plan to transition to a permanent kinship placement with assistance from T-PEP at the earliest juncture.

In this case, there are a few procedural issues that should be noted. La. Ch. C. art. 702(A) mandates that a permanency hearing be held to "consider in-state and out-of-state permanent placement options for the child, *within thirty days* of a judicial determination pursuant to Article 672.1 [when] reunification efforts are not required." (Emphasis added). In this case, it was clear no later than April 2019 that the child had no living biological parents so, by June of 2019, there should have been a permanency hearing with placement options and a permanent plan. *See*, La. Ch. C. art. 702(C).[5] This failure by DCFS is what has brought us to this moment. If the trial court determines that the agency failed to comply with the

_____

[5] La. Ch. C. art. 702(C) provides, in pertinent part:

> The court shall determine the permanent plan for the child that is most appropriate and in the best interest of the child in accordance with the following priorities of placement:
>
> * * *
>
> (2) Adoption.
>
> * * *
>
> (4) Placement in the legal custody of a relative who is willing and able to offer a safe, wholesome, and stable home for the child.
>
> * * *

17

permanency planning requirements, the trial court has, and should, utilize its ability to sanction DCFS under La. Ch. C. art. 712.[6]

We further caution the parties to refrain from *ex parte* communications and instruct the trial court to be wary of them. *Ex parte* communications are prohibited by the Code of Judicial Conduct because they are directed in a focused way at changing the behavior of the court, without the protection of full contemporaneous disclosure to all parties. That guarantee is in place to ensure that the information at issue be conveyed timely and with the equivalent ability of all parties to challenge it simultaneously as to weight or veracity. We cannot say that this *ex parte* communication itself had the effect the Code of Judicial Conduct seeks to prevent. In a proceeding as sensitive as the one before us, the outcome of which will affect the future of a very young child, full contemporaneous disclosure amongst all parties and the court is of critical importance.

Conclusion

Under the statutory scheme in place for children adjudicated in need of care and placed in the custody of DCFS, the court retains the ultimate authority over a child's placement and may approve or reject a case plan submitted by the Department, but it may not revise the plan or make any particular placement itself. In the instant case, the juvenile court's order that Z.U., a child adjudicated in need of care, and placed in the custody of DCFS, not be moved from a particular foster home was in violation of La. Ch. C. art. 672(A) as it made a particular placement

---

[6] Pursuant to La. Ch. C. art. 712, the court may:

(1) Subpoena agency witnesses to testify regarding the failure to comply.

(2) Order the agency or appropriate representatives to show cause why a contempt order should not issue.

(3) Order that the agency not seek federal reimbursement for the cost of the child's care where the court finds that reasonable efforts were not made.

(4) Submit a report of noncompliance to appropriate state and federal agencies.

(5) Refer the agency representative found responsible for the failure to comply to the appropriate department personnel for administrative reprimand or other administrative sanctions.

choice DCFS alone was entitled to make. Therefore, the trial court's order that Z.U. remain with the foster parents is reversed, and the case is remanded to the juvenile court. In consideration of the fact that this matter should have been resolved in June of 2019, we further order that the juvenile court convene a hearing within 15 days of the issuance of this opinion to expedite the proceedings in a manner consistent with the reasons stated herein.

**<u>REVERSED AND REMANDED</u>.**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES



**FIFTH CIRCUIT**

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

CURTIS B. PURSELL
CLERK OF COURT

MARY E. LEGNON
CHIEF DEPUTY CLERK

SUSAN BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **MAY 13, 2020** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

CURTIS B. PURSELL
CLERK OF COURT

# 20-CA-26

**E-NOTIFIED**

JUVENILE COURT (CLERK)
HON. BARRON C. BURMASTER (DISTRICT JUDGE)
LAURA W. MALVEAU (APPELLANT)      KIRBY N. KENNY (APPELLANT)      SHEILA H. WILLIS (APPELLEE)
BERNADETTE R. LEE (APPELLEE)      SCOTT L. STERNBERG (APPELLEE)   WILLIAM B. GORDON, III (APPELLEE)

**MAILED**

EDITH H. MORRIS (ATTORNEY)          MARIA I. O'BYRNE STEPHENSON
SUZANNE ECUYER BAYLE (ATTORNEY)     (ATTORNEY)
1515 POYDRAS STREET                 400 POYDRAS STREET
SUITE 1420                          SUITE 1990
NEW ORLEANS, LA 70112               NEW ORLEANS, LA 70130